### WENATCHEE REX SPRAY CO. et al. v. REX CO. et al.*

Circuit Court of Appeals, Ninth Circuit.
October 29, 1929.

No. 5776.

*Rehearing denied December 17, 1929.

John H. Miller and A. W. Boyken, both of San Francisco, Cal., Alfred Gfeller, of Wenatchee, Wash., and David E. Snodgrass, of San Francisco, Cal., for appellants.

Francis C. Downey, of Kansas City, Mo., Fred L. Chappell, of Kalamazoo, Mich., W. B. Morton and David Weild, Jr., both of New York City, and A. E. Russell, of Spokane, Wash., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge. Appellees filed a bill in equity for the purpose of restricting the activities of the appellants with reference to the sale of a fly poison manufactured according to a formula developed, or discovered in 1922, by a research fellowship in the Mellon Institute of Pittsburgh, Pa., established in 1916 and renewed annually thereafter. This preparation was advertised and marketed under the trade-name and trade-mark of "Fly-Tox."

It is stated by the appellants that the most important question involved in this litigation is the right to sell this preparation in Portland, Or., and the province of Alberta, Canada. The appeal is from an interlocutory decree defining the rights of the parties and providing for an accounting in accordance with its terms.

In order to understand the rights of the parties to the preparation known as Fly-Tox it will be necessary to state the facts showing the relations between them at the time of the Toledo agreement in 1916. Mr. F. O. Moburg had developed the formula for, and methods of manufacture of, a fruit spray consisting of a solution of lime and sulphur. This product was very bulky, and was sold very cheaply in order to compete with other fungicides and insecticides already on the market. The selling price to the user was approximately 1 cent a pound. In order to compete with local products and to avoid excessive freight rates which would prevent any profit, Mr. Moburg conceived the idea of establishing manufacturing plants in fruit-growing sections. The original or parent plant was located at Omaha, Neb. It was desired to locate another plant in the fruit-growing section of the state of Washington, and for that purpose the appellant corporation was formed at Yakima, Wash., known as the Yakima Rex Spray Company, and certain rights were conveyed to it by the parent company of Omaha. This appellant corporation will be hereinafter referred to as the Yakima Company. This agreement, made August 2, 1907, between the parent company and the Yakima Company, is particularly important for the reason that the parties herein predicate their territorial rights in this litigation upon the terms of that contract. The appellant the Wenatchee Rex Spray Company, hereinafter referred to as the Wenatchee Company, was organized in the state of Washington in 1908, and certain rights theretofore exercised by the Yakima Company were transferred to it by the latter. In this litigation it is basing its entire claims upon the contract of 1907 between the Rex Company and the Yakima Company and upon the Toledo agreement and certain other agreements which will be referred to shortly.

The agreement of August 2, 1907, between the Rex Company and the Yakima Company assigned exclusive rights in the Rex products then developed and thereafter to be developed, in the entire state of Washington and that portion of British Columbia west of the meridian bounding the northern part of Idaho on the east; that is, that portion west of the thirty-ninth meridian west of Washington, also those portions of the states of Idaho and Oregon where the freight rates "shall be" less from Yakima, Wash., than from Benicia, Cal. The reason for this provision with reference to freight rates from Benicia, Cal., was that Mr. Moburg contemplated founding another subsidiary company at that place. This company, the appellee the California Rex Spray Company, was afterwards organized in 1908, and similar rights were conveyed to it by the Rex Company. In defining the California Company's exclusive territory in Oregon, it was provided that they should have exclusive rights in those portions of the state of Oregon in which the freight rates are less

from Benicia, Cal., than from Yakima, Wash. It will be observed that the future tense was used with relation to the territory assigned to the Yakima Company and the present tense with reference to that assigned to the Benicia Company. The appellants contend that under the agreement the territory assigned to the Yakima Company in Oregon and Idaho varied with the freight rates, and that, when at any time the freight rates from Yakima became less than the freight rates from Benicia, Cal., in any portion of Oregon or Idaho, that territory was thereby automatically transferred to the Yakima Company or its successors.

On the other hand, the appellees contend that, notwithstanding the use of the future tense "shall be" in the agreement with relation to the territory, the contract should be construed as though the present tense was used, and that, as the freight rates to Portland were less from Benicia, Cal., than from Yakima, Wash., at the time the contract was entered into, that territory was never assigned to the Yakima Company, but was assigned to the appellee California Rex Spray Company. It is clear that there was a conflict between the boundaries assigned to the two companies if the contention of the appellants is sustained.

In this connection it should be stated that Mr. Moburg organized both the Yakima Company and also the California Rex Spray Company, hereinafter referred to as the California Company, and that he subscribed to a majority of the capital stock of each corporation for the parent company. The subscription agreement to the formation of the Yakima Company signed by the parent company, in defining the territory to be assigned to it by the parent company, used the present tense "are" with reference to the freight rates. When the territory was assigned to the corporation, the future tense was used in the contract as to Oregon and Idaho territory, but the whole of Washington was included, and also British Columbia, as above stated. At the time these contracts were entered into by reason of the high freight rates on so bulky and cheap a product as the sulphur and lime spray and by reason of competition from other producers, the exact boundaries of the territory assigned to the various subsidiary corporations were not of great consequence. The California Company made some sales of Rex lime and sulphur in Oregon and finally established a manufacturing plant in Medford in Southern Oregon for the purpose of developing that territory and thus saving freight from Benicia, but abandoned that project as unprofitable.

At the meeting held in Toledo, Ohio, in 1916 by the representatives of all the Rex Companies, parties hereto, an oral agreement was made for the establishment of a research bureau in the Mellon Institute. The substance of that agreement is alleged in the bill, sustained by uncontradicted testimony, and found by the trial court to have established exclusive rights of each company in its own territory in any discovery resulting from such research. The allegation of the bill is as follows:

" * * * That each contributing corporation should have the right to the exclusive use and benefit within its specific territory of inventions, discoveries, improvements, determinations, investigations and research of said bureau * * * but no contributing associate should be entitled to any other or greater individual right in or to such discovery * * * than such right of individual user within and confined to its specific territory by it held under its said license agreement * * * with said The Rex Company, except, etc. * * * "

The appellants denied this allegation as to the agreement for a specific and exclusive right within a defined territory. This agreement was participated in by the parent company, by the two appellant companies, and by the California Company.

Motortruck transportation was established in Eastern Washington in 1919, and thereafter, before the institution of this suit, the exact time is in some doubt from the evidence, established freight rates by motortrucks from Yakima, Wash., to Portland, Or., less than the freight rates from Benicia, Cal., to Portland.

We have not thus far distinguished between the rights of the Yakima Company and the rights of the Wenatchee Company. It should be stated at this juncture that the Yakima Company has conveyed its rights to the manufacture and sale of Rex Spray products outside certain counties in Washington theretofore assigned to the Yakima Valley Rex Spray Company to the Wenatchee Company. The agreements effecting such transfer, however, have an important bearing upon the controversy as to territorial rights. Two agreements were made on February 27, 1923, for the purpose of effecting this transfer. The parent company joined in one of these agreements apparently for the purpose of consenting, for the first time, to the giving of its secret formula to the Wenatchee Company. The significance of

this agreement so far as the present controversy is concerned arises from the fact that, in reciting and defining the territorial rights of the Yakima Company under the original agreement of 1907 between the Rex Company and the Yakima Company, it is stated that that right "was" the exclusive right to manufacture and sell said products in the following territory: " * * * That portion of the state of Washington where the freight rates from Yakima, Washington are less from the point of delivery therein than from the plant of the California Rex Spray Company at Benicia, California." It is further recited that the purpose of the agreement is to transfer all the remaining rights of the Yakima Company to the Wenatchee Company and the right assigned is to the territory described in the above-mentioned recital.

The Wenatchee Company, since 1922, has actually supplied the Portland trade with Fly-Tox by motorbus transportation from a new factory it had established in Seattle, Wash., for the manufacture of Fly-Tox. Mr. Moburg during all this time retained for himself, or his parent company, a majority of the stock in each of the subsidiary corporations, with the exception of the Wenatchee Company, the stock in which was owned by Mr. West and Mr. Muirhead and their respective wives. Shortly after the discovery of Fly-Tox, the Wenatchee Company began operations in the province of Alberta, Canada, the territory originally assigned to the Canada Rex Spray Company, hereafter referred to as the Canada Company, under an agreement with that company, which will hereinafter be discussed in connection with the question of the Alberta rights.

In view of the controversies which had arisen with reference to the territorial boundaries of the California and Wenatchee Companies, a conference was called in 1924 at Kansas City, Mo., to which the headquarters of the parent company had been removed from Omaha, Neb. A second and a third conference were held in Portland, Or., later in 1924, for the same purpose. At these conferences the Wenatchee Company claimed the right to sell Fly-Tox to the jobbers in Oregon, and an interest in the foreign rights for the sale of Fly-Tox in proportion to the amount paid by them to sustain the research at the Mellon Institute. Their claim to the city of Portland as a part of their selling territory was based upon their interpretation of the Yakima agreement of 1907, but more particularly upon the fact that they had gone into that territory and developed it with the knowledge and acquiescence of the other companies and that Mr. Moburg himself, while acting as general manager of the Yakima Company, had sold Fly-Tox in Portland in 1922 before he disposed of his stock in the Wenatchee Company to Muirhead and West. The claim of the Wenatchee Company in the foreign rights to Fly-Tox asserted at Kansas City and Portland were based upon a written agreement dated February 23, 1922, signed by the parent and subsidiary companies, which provided that the rights to the patents on products or processes developed at the Mellon research should be in the various subscribing Rex companies in proportion to the money they contributed to pay the expense of such research. If this agreement of February 23, 1922, with relation to the discoveries made at the Mellon Research Bureau is taken as the sole and only measure of the rights of the parties in and to the results of that research, as appellants contend, there is no doubt that there is a joint ownership in these discoveries and that there is no exclusive territorial right in said discoveries. However, all parties jointly interested in the rights established by the agreement of February 23, 1922, as to the ownership of discoveries are insisting upon exclusive rights within the territory originally assigned to them.

In connection with the question of foreign rights, it should be stated that the Wenatchee Company had made application for trade-mark registration and planned for the sale of Fly-Tox in England, New Zealand, and Australia, basing its claims so to do upon the agreement of February 23, 1922. It is now conceded by the Wenatchee Company that it should not have entered upon this scheme of foreign exploitation, and the interlocutory decree enjoins appellants from carrying out this plan and requires them to confess judgment in certain suits pending in Great Britain instituted by the appellees for the purpose of preventing further operations by the Wenatchee Company in Great Britain.

In view of our conclusion concerning the agreements arrived at in Kansas City, and later modified at Portland, we find it unnecessary to determine the controversies over the proper interpretation of the territorial agreement of 1907 from the parent company to the Yakima Company, or to determine the effect of other above-mentioned agreements and transactions prior to the Kansas City agreement thereon, where these various perplexing controversies were settled by the agreement of the parties.

We will now consider the nature and effect of the agreements and negotiations between the parties in 1924, first in Kansas City and later in Portland.

It is alleged in the bill that at the Kansas City conference an agreement was reached as to the whole subject in controversy, and this agreement and the terms thereof are proved by an overwhelming preponderance of the testimony.

The appellant West, as a witness, alone denies that an agreement was there reached, and appellant Muirhead, while admitting that an agreement was reached which was subsequently submitted to him (now identified as Plaintiffs' Exhibit 24), testified that the written agreement so submitted was not in accordance with such an agreement solely because it provided that the Wenatchee Company should pay to the California Company 5 per cent. of its gross income from the sale of Fly-Tox in the city of Portland, calculated on retail dealers cost price basis, although, as he testified, the agreement arrived at did not so provide.

The Wenatchee Company, upon receipt of a written form of an agreement containing the above provisions and purporting to set forth the terms arrived at in Kansas City, declined to sign it. The Portland conference was called in an attempt to obviate the objections of the Wenatchee Company to the form of the Kansas City agreement, and it is admitted and asserted by all concerned that an agreement was there reached to execute the Kansas City agreement as submitted (Plaintiffs' Exhibit 24) with the 5 per cent. royalty on the Portland sales omitted therefrom. This concession as to the Portland royalty was upon condition that the Wenatchee Company sign and execute Plaintiffs' Exhibit 24, with the Portland royalty clause omitted. The Wenatchee Company claims that it has not yet been put in default for not signing this agreement, and this is true. The situation in the case as to these compromise agreements is somewhat peculiar. The bill of complaint alleged, in general terms, the 1924 agreements made in Kansas City as modified in Portland, and sought to enforce these agreements, but does not set forth these agreements or either of them in hæc verba, or by a statement of their general effect in entirety. The appellants denied the making of the agreements in all the terms and to the general effect pleaded. The appellees, however, claim that the appellants by their answer and counterclaim have repudiated these compromise agreements, and therefore, after the appel-

lants' answer was filed, amended their bill in an unsuccessful attempt to accept the appellants' alleged repudiation of these compromise agreements, and now seek an adjudication of the rights of the parties based on the original agreements between them, namely, the 1907 agreement between the parent company and the Yakima Spray Company and the Toledo agreement of 1916, with reference to the ownership of the discoveries of the Mellon Institute fellowship.

Properly construed, the answer of the appellants does not deny that the agreement set up in the bill as having been made at Kansas City was in fact made there. The denial is a conjunctive denial to an allegation covering several pages of the bill, and is therefore entirely insufficient to put in issue either the making or the terms of the said agreement. The trial court and the parties, however, assumed the sufficiency of these denials. We will not, therefore, consider in detail this condition of the pleadings which is not discussed by the parties, although it should be said that the appellants insist that they do not now and never have denied that an agreement was reached at Kansas City and Portland. On the contrary, it is claimed that these rights were determined at these meetings and that it desires to abide by such agreement. The parties meeting at Kansas City were all mutually interested in the manufacture and sale of a common product. They are not only interested in the formula for the manufacture of the product and in the trade-name and trademark under which it was marketed, but also in the advertising campaign without which the discovery would be absolutely valueless. At Kansas City and again at Portland they were engaged in an effort to determine rights which were theretofore in doubt. The appellants at Kansas City were claiming foreign rights in the Fly-Tox formula as well as in the United States. It is true that they depreciated the value of these rights and that Mr. Muirhead, speaking for the Wenatchee Company, said in effect that they wanted to have nothing to do with their exploitation. This declaration was accepted by the trial court as an abandonment of the foreign rights of the Wenatchee Company in the Fly-Tox preparation. This mere declaration with reference to the value of property jointly owned by all the parties in conference should hardly be considered an abandonment of rights which were then asserted, particularly in view of the fact that the negotiations at both Portland and Kansas City were directed toward the proposition of giv-

ing the Wenatchee Company something in exchange for those rights. The appellant justly complains that its foreign rights, if it has any, should not be taken from it because of what occurred at the Kansas City conference and at the same time the consideration for the surrender of its rights be retained by the other companies. Furthermore, it seems incongruous to hold that the Wenatchee Company had abandoned its foreign rights at the very time it was prosecuting those rights so diligently that it had to be enjoined from perfecting them in England, Australia, and New Zealand. It is clear that it did not in fact abandon its rights. There is no principle of estoppel involved which would hold it to a declaration made by its officers in the course of negotiations in reference to the disposition of its foreign rights.

No written agreement was ever prepared embodying the amendments to the draft of the Kansas City contract agreed upon in Portland. The appellants, however, acted upon that agreement in returning to the Canada Company the written agreement under which it was operating in Alberta, which provided for 5 per cent. royalty to be paid by it to the Canada Company, with the signatures torn off and with the statement that they would continue to pay the royalty during the balance of the year and thereafter would pay no more. This was in accordance with the Portland agreement. So far as appears from the record, they accepted and acted upon the Portland agreement from that time, and the appellees claim that they did also, in bringing this suit, count upon the Portland agreement. The Kansas City and Portland agreements related to a trade-mark, a trade-name, and a good will which had been created and were to be continued by joint advertising. These rights were incapable of satisfactory determination and preservation in any other way than by mutual agreement either express or implied. For, under the original agreements relating to the disposal of the lime and sulphur solution, economic conditions exercised such complete control that there was little danger of serious invasion of territory by the parent or subsidiary corporations; but the unanticipated change of the business of these corporations from the heavier and less valuable product to the lighter and more valuable Fly-Tox preparations has completely altered the economic situation. Apparently the Fly-Tox can be shipped anywhere in the United States and sold with profit notwithstanding the transportation costs. The Wenatchee Company sent several carload lots to Great Brit-

ain with a view of opening the market there. The spray solution was sold directly to the user, and the Yakima Company and other companies were composed of users who became stockholders for the purpose of manufacturing the product for themselves and for local distribution. Fly-Tox was not sold directly to the consumer, but to jobbers for distribution to retailers, who in turn sold to the consumer. It is agreed by the parties hereto that restrictions upon the sales of Fly-Tox, after it reaches the hands of the jobber, are impractical. It seems also to be admitted, at any rate it is clear, that Portland is the jobbing center for a large part of the state of Washington. If Portland is assigned to the California Company, the distribution of Fly-Tox by Portland jobbers in Washington and Oregon will practically destroy the value of the territory which was assigned exclusively to the Yakima Company under the 1907 agreement. If the 1907 agreement is to be enforced in these proceedings, we see no reason why the exclusive rights of the Wenatchee Company in the state of Washington and in certain counties in Oregon should not be fully and amply protected against an invasion of Fly-Tox placed in the hands of Portland jobbers by appellees. The Rex Company not only granted exclusive sale rights to appellants in the state of Washington, but also to make those rights effective expressly agreed in the 1907 agreement with the Yakima Company above referred to, as follows:

"* * * And within said described territory, said first party (The Rex Company) shall not solicit orders for, or sell, *or furnish for use therein*, said 'Rex Lime in Sulphur Solution' * * * or other material, * * * it being the intention hereof to *assure to the second party* (the Yakima Company) *the exclusive sale within said described territory of* * * * materials which shall be manufactured and sold by second party of similar kind and quality to those manufactured and sold by first party." (Italics ours.)

The interlocutory decree defines the rights of the parties in the results of the research bureau as follows:

"The contract entered into by the parties and referred to therein relates to a joint venture of the said parties *for the good of their respective business enterprise in their own specifically defined territory and not elsewhere*, and that the parties were entitled to the fruits and benefits of said venture, *each for exclusive use in its own particularly defined territory*, and the evidence discloses no

property right or income arising out of such joint adventure requiring apportionment by the court." (Italics ours.)

In order to define their territorial rights, the parties at Kansas City and later at Portland adopted a practical construction by which each was protected from an invasion of its territory. We can see no obstacle to the court's adopting this practical construction placed by the parties upon their rights growing out of the original assignment of territory and their joint interest in Fly-Tox. These agreements were merely interpretive of existing agreements, as is stated therein as follows:

"(k) The contract evidenced hereby shall not be deemed a new contract between the parties except as the necessities of the case may require and as to provisions not covered by existing contracts now in force, but is and shall at all times be construed as, supplemental to and as a construction and explanation of existing contracts. It shall never be construed as a revocation or cancellation of any existing contract except as hereinafter stated, but rather as an express affirmance of each such existing contract, whether such be inter partes as a whole, or between any party and the Rex Company, but, nevertheless, if there shall arise any conflict between the intent and meaning of any existing contract or contracts (whether between the parties hereto as a whole or between Rex Company and any individual signatory) and the provisions of this contract, this contract shall prevail as expressing the real meaning and intent of the parties to any such existing contract in the making thereof, anything in any such contract to the contrary, or apparently to the contrary, contained, notwithstanding. Provided always, that that certain contract specifying the rights of the parties in Bureau and Mellon discoveries and inventions of date February 23, 1922, and to which F. O. Moburg and Yakima Rex Spray Company are also parties, is hereby abrogated and forever annulled."

The agreement at Kansas City under which appellants were to continue permanent business in Alberta was dependent upon the surrender by the Wenatchee Company of its claim to the foreign rights in the sale of Fly-Tox. The interlocutory decree confirmed these foreign rights in the Rex Research Corporation, and by mandatory injunction required the appellants to refrain from exploiting that territory and to confess judgment in favor of the appellees in certain suits brought by appellees and pending in Great Britain to enjoin appellants from further proceeding with applications for trademark there; thus the interlocutory decree confirmed in the appellees the agreed consideration for the Alberta rights, so there seems no good reason why the appellants should not have the rights agreed upon at Kansas City as a consideration for the surrender of its foreign rights.

The Kansas City contract (Plaintiffs' Exhibit 24, as modified at Portland) is alleged in the original bill to be the controlling agreement between the parties, and its allegations to that effect have not been withdrawn. Notwithstanding appellees' amendments to their bill and alleged withdrawals of their prayer, the Kansas City agreement, as modified at Portland, still stands as the basis of the bill. The Wenatchee Company, in its briefs and argument, has also indicated its willingness to be bound by the Portland agreement.

The decree is reversed, and the trial court instructed to enter an interlocutory decree requiring all the parties to sign, within a reasonable time fixed by the court, the Portland agreement (Plaintiffs' Exhibit 24); said agreement to be dated September 5, 1924, with the following clause stricken therefrom, to wit:

"And for the like consideration the said Wenatchee Company shall pay, and the Wenatchee Company covenants to pay the said California Company five per centum of its, Wenatchee Company's gross income from the sale of Fly-Tox in said city of Portland, calculated on retail dealers cost price basis."

The provisions of the present decree, in so far as they affect the foreign rights, are not in conflict with the agreement of September 5, 1924, and shall be incorporated in the decree as modified. The accounting provided by the modified decree shall be limited to the 5 per cent. royalty on Portland sales between the date of the oral agreement at Kansas City and September 5, 1924.